**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

HERC HOLDINGS INC. AND
HERC RENTALS INC.,

     **Plaintiffs,**

                                 **CASE NO.:**

**v.**

CHRIS MEYER,

     **Defendant.**

**COMPLAINT AND APPLICATION FOR**
**INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Herc Holdings Inc. and Herc Rentals Inc. (collectively, "Herc") bring this action for preliminary and permanent injunctive relief and monetary damages against Defendant Chris Meyer ("Meyer").

Herc is a construction equipment rental company. Meyer is a former Herc District Manager. Meyer signed a restrictive covenant agreement with Herc that included non-disclosure, non-solicitation, and non-competition provisions. During his employment, and in exchange for his restrictive covenants, Herc gave Meyer access to some of its most protected trade secrets and other confidential and proprietary information, including highly sensitive information relating to Herc's business operations and strategic plans.

Meyer resigned from Herc and accepted a consulting position with a direct competitor to perform competitive duties that impact Meyer's contractually restricted

1

territory. Unbeknownst to Herc, Meyer had absconded with highly confidential information and proprietary information and trade secrets belonging to Herc prior to his departure; and then, upon taking a consultant role with one of Herc's direct competitors, disseminated such documents to that direct competitor. Consequently, Herc brings this action seeking to recover both monetary and injunctive damages resulting from Meyer's numerous breaches of his employment agreement and other unlawful conduct.

## PROCEDURAL AND JURISDICTIONAL FACTS

### The Parties

1.      Herc Holdings Inc. is a Delaware corporation with its principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134.

2.      Herc Rentals Inc. is a Delaware corporation with its principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134.

3.      Meyer is an individual who resides at 5909 108th Pl., Chicago, Ridge, Illinois, 60415, and has, up until recently, provided services for one of Herc's direct competitors and disclosed confidential information while providing such services.

### Jurisdiction and Venue

4.      The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2

5.      This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1331 because it raises federal questions, specifically claims under the federal DTSA, 18 U.S.C. § 1836.

6.      The Court has supplemental jurisdiction over the various state law claims set forth herein, pursuant to 28 U.S.C. § 1367, because they are so related to the federal claims that they form part of the same case or controversy.

7.      The Court has personal jurisdiction over Meyer because he engaged in systematic and continuous activity within Bonita Springs, Florida where Herc's corporate headquarters are located; Herc's information technology servers to which Meyer would connect to perform his duties are located in Florida; Meyer regularly traveled to Florida to attend planning and strategic meetings; Meyer signed an agreement whereby he consented to jurisdiction in Florida, and he violated the FUTSA and DTSA, harming Herc in Florida.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Herc's claims occurred in the Middle District of Florida, and Meyer is subject to this Court's personal jurisdiction with respect to this action based on the forum selection clause in the agreement he executed.

## STATEMENT OF FACTS

### Herc is a Premier, Full-Service Equipment Rental Company

9.      Headquartered in Bonita Springs, Florida, Herc is a premier, full-service equipment rental company that provides customers the equipment, services, and solutions they need to achieve optimal performance safely, efficiently, and effectively. With nearly 60 years of equipment rental expertise, approximately 9,900 employees, and 612 company-operated branches in the United States and Canada, Herc serves a vast array of customer markets. A pioneer of the equipment rental industry, Herc continues to evolve and grow through technological innovations, expanded product offerings, value-added services, and consultative solutions to support customers' projects.

10.      Herc strives to have the best and broadest selection of premium rental equipment available and ready when its customers need it, ensuring the equipment performs as promised and provides unsurpassed customer service at every opportunity. Herc continuously creates a supportive, inclusive, and collaborative work environment that offers excellent career opportunities. It offers employees like Meyer the training and tools they need to ensure their success. Herc is focused on top-tier business performance, both operationally and financially—and on continuously earning investors' confidence in the Herc team.

11.      In addition to Herc's principal business of equipment rental, Herc: sells used equipment and contractor supplies such as construction consumables, tools, small equipment, and safety supplies; provides repair, maintenance, equipment

4

management services, and safety training to certain of its customers; offers equipment re-rental services; and provides on-site support to its customers. Herc also provides ancillary services such as equipment transport, rental protection, cleaning, refueling, and labor. Herc also offers its customers financing options for both short- and long-term rentals.

12. Herc's classic fleet of equipment includes aerial equipment such as boom and scissor lifts, earthmoving equipment such as excavators and skid steers, material handling machinery, trucks and trailers, air compressors, compaction and lighting, and its equipment rental business is supported by ProSolutions®, its industry-specific solutions-based services, which include power generation, climate control, remediation and restoration, trench shoring, studio and production equipment, and its ProContractor professional grade tools.

13. Herc has an estimated 5% market share by revenue with 612 locations in 46 states in the United States and 5 provinces in Canada—including many branches throughout the Midwest.

14. Herc has historically been committed to growing its Midwest market, including the greater Chicago area, along with Wisconsin, Ohio, Michigan, and surrounding areas (the "Midwest Market").

15. Importantly, the greater Chicago area is considered the sixth-largest market for such equipment rentals, a ranking that reflects the sheer volume of construction, industrial, and infrastructure activity concentrated in the region.

16.    Because rental demand in a market of this size is driven by thousands of contractors, project managers, and equipment buyers making purchasing and pricing decisions every day, detailed information about how to capture and retain market share in this geographic area carries substantial competitive value.

### Meyer's Employment and Restrictive Covenants with Herc

17.    Meyer worked for Herc as a District Manager serving in the North Central Market.

18.    As a District Manager for Herc, Meyer was responsible for overseeing and developing Branch Managers at every location throughout the North Central Market to ensure that each location operated efficiently and met the company's performance standards; ensuring that each location maintained appropriate fleet levels; meeting the company's revenue and pre-tax profit goals for the branch profit center while working to reduce operating expenses; along with various other tasks required to run the business. Meyer was also responsible for the sales strategy for the North Central Chicagoland and Wisconsin Markets.

19.    On or about June 18, 2019, Meyer entered into the Employee Confidentiality and Non-Competition Agreement (Ex. 1, the "RCA") with Herc—both Herc Holdings and Herc Rentals.

20.    Herc would not have employed or continued to employ Meyer without the assurances contained in the RCA. And, in turn, Meyer acknowledged that his agreement to those restrictions was a material condition of his employment.

6

21.     In connection with all restrictive covenants in the RCA, Meyer acknowledged that the restrictive covenants, including the duration and geographic scope, were reasonable and necessary:

> In view of the services which the Employee will perform for the Company, which services are special, unique and extraordinary in character and which will place the Employee in a position of confidence and trust with customers of the Company and will provide the Employee with access to confidential and proprietary financial information, trade secrets, 'know-how' and other confidential and proprietary information of the Company as set forth above, the Employee expressly acknowledges that the restrictive covenants set forth in this Section 3 are reasonable and necessary to protect and maintain the proprietary and other legitimate business interests of the Company and that the enforcement of such restrictive covenants will not prevent the Employee from earning a livelihood or impose any undue burden on the Employee or Employee's family.

*Id*. at § 3(e).

22.     Meyer further agreed that there would be an inadequate remedy at law for any violation:

> The Employee further acknowledges that the remedy at law for any breach or threatened breach of this Section 3 by Employee, if such breach or threatened breach is held by the court to exist, will be inadequate and, accordingly, that the Company shall, in addition to all other available remedies, be entitled to injunctive relief without being required to post bond or other security and without having to prove the inadequacy of the remedies available at law.

*Id*. at § 3(e).

23.     Meyer also agreed that, in the event a court determines that there has been a breach or threatened breach or repudiation of any of the restricted covenants by Meyer, Meyer agreed that in addition to injunctive relief and monetary damages, the Company "shall be entitled to recover from the Employee its reasonable attorneys'

fees and costs in obtaining any restraining order, preliminary or permanent injunction or any monetary judgment against [him]." *Id.* at § 3(e).

24.    Meyer further agreed that the court could judicially modify the agreement to reflect the parties' intent:

> If any portion of the provisions of this Section 3 is held to be unenforceable for any reason, including but not limited to the duration of such provision, the territory being covered thereby or the type of conduct restricted therein, the parties agree that the Court is authorized and directed to modify the duration, geographic area and/or other terms of such provisions to the maximum benefit of the Company as permitted by law, and, as so modified, said provision shall then be enforceable.

*Id.* at § 3(f).

25.    The RCA contains a tolling provision such that, "[t]he period of time during which the provisions of this Section 3 shall apply shall be extended by the length of time during which the Employee is deemed to be in breach of any of the terms of this Section 3." *Id.* at § 3(g).

26.    In the RCA, Meyer acknowledged that "in connection with [his] employment, [he would] receive and have access to [the Company's] confidential, proprietary, and trade secret information and data." (*Id.* at p.1.)

27.    Based on the sensitive nature of the Company's confidential and proprietary information and trade secrets, Meyer agreed as follows:

> The Employee therefore covenants and agrees, for the duration of this Agreement and at all times following its termination, that Employee will not use or disclose (other than in furtherance of the Company's business interests during the term of this Agreement and as authorized by the Company) any confidential or proprietary information and trade secrets of the Company, including, but not limited to, customer and supplier lists, customer or prospect information, pricing information, business

8

plans, business development plans and other strategic plans or information, contract and negotiation strategies, Company reports and analyses, Company processes, techniques and systems used or considered for use, Company financial records, sales and marketing information, patents, patent rights, inventions, trademark or trade name rights, copyrights and other intellectual property rights, techniques, know-how and trade secret information, plans or information regarding the Company's future products and services and other business and financial information of or relating to the Company or its customers (collectively, the 'Confidential Information'). Employee understands that such Confidential Information was disclosed to Employee in confidence and for use solely in connection with the business of the Company, and Employee agrees to retain all such information in trust for the sole benefit of the Company.

Ex. 1, § 3(a).

**28.**    Meyer agreed to the following restriction on competition:

During the term of this Agreement and Employee's employment by the Company, and for a period of one (1) year after the termination of Employee's employment with the Company, whether said termination was voluntary or involuntary, the Employee shall not, without the prior written consent of the Company, directly or indirectly, whether as a principal, agent, officer, director, partner, employee, consultant, independent contractor or in any other capacity whatsoever, alone or in association with any other person or entity, be employed or retained by, own, manage, operate, control, partner with, be associated with, render services or assistance to, or own, share in the earnings of, or invest in the stocks, bonds or other securities of any business, firm, corporation or institution that is directly or indirectly in competition with the Company within one hundred (100) miles of the Company branch, location, or office(s) where Employee worked or was employed, or provided support or services, or within the geographic scope of Employee's responsibilities at the time of Employee's termination and during the twelve (12) month period preceding termination. An individual or entity will be presumed to be in competition with the Company if the individual or entity rents or leases the same or similar types or kinds of products and/or services as those rented or leased or which were in research and development by the Company at any point during the term of this Agreement. The foregoing restriction will not preclude the Employee from owning up to 1% of the stock of a publicly-traded company.

9

For purposes of this Agreement, the phrase 'competition with the Company', 'competitive business' and 'competitor' shall be defined as: (1) United Rentals, Sunbelt Rentals, Ahern Rentals, H&E Equipment Services, Sunstate Equipment Co., BlueLine Rental, Cat Rental Stores (Caterpillar), Synergy Equipment, Platinum Equity, Studio Services, Star Rentals, Aggreko, Enterprise Truck Rentals, Barco Rent a Truck and Home Depot Rentals; (2) any person, company or entity engaged in the business of renting or selling general, construction, industrial, entertainment or remediation equipment and/or services and equipment-related solutions, including equipment for rent or sale contained on the Company's website (www.hercrentals.com), in any of the Company's printed rental solutions guides or on Herc Rentals @ applications, available for smartphones and tablets on various operating systems; (3) any person, company or entity engaged in the business of renting or selling equipment related to, or for use in, the entertainment business and/or events, including but not limited to concerts, plays, television series, studio work, movies and movie production, documentaries, sporting events or other entertainment-related business or events; (4) any person, company or entity that rents or leases the same or similar types or kinds of products and/or services as Company, including but not limited to general and/or heavy construction equipment rental, leasing and/or sharing and related services; and/or (5) any successors of the aforementioned.

*Id.* at § 3(b).

29.     Meyer agreed to the following restriction on solicitation:

Employee agrees that during the term of this Agreement, and for a period of one (1) year following the termination of the Employee's employment with the Company, whether said termination was voluntary or involuntary, the Employee shall not, as a principal, proprietor, director, officer, partner, shareholder, employee, member, manager, consultant, agent, independent contractor or in any other capacity, on behalf of Employee or on behalf of any other person, company or entity other than the Company, directly or indirectly; (i) Solicit or attempt to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of the Company whom the Employee came to know, came to service, had material contact with or came to learn the identity of or about whom Employee had Confidential Information while Employee was employed by the Company[.]

*Id.* at § 3(c).

### Meyer's Access to Confidential Information, Including Trade Secrets

30.    As a District Manager, Meyer had access to a great deal of highly confidential information and trade secrets - information which Herc vigorously protects from competitors. For example, Herc permitted Meyer to access, and he regularly used, numerous types of confidential information in performing his job duties, particularly information about Herc's profits and loss, fleet size, fleet condition, employee metrics, branch metrics, business and strategic plans, organization and marketing and growth strategies.

31.    The above-referenced confidential and proprietary information and trade secrets, all of which the Company authorized Meyer to access while serving as Herc's employee, are highly sensitive, commercially valuable, and would be extremely useful to competitors in their efforts to compete with Herc for business and market share.

32.    For example, information about Herc's profit and loss statements and business strategy would reveal precisely how the company intends to compete for business in a market like the greater Chicago area. That information discloses Herc's projected margins, cost structure, and pricing flexibility, along with the specific strategic initiatives it plans to pursue to grow and defend its share of one of the nation's largest rental markets.

33.    A competitor with access to this forward-looking financial and strategic roadmap could time its own pricing and pitches to target the same key accounts, and

11

counter the company's planned initiatives, causing harm that would be far more severe than if this information concerned a smaller, less consequential market.

34.    Herc invests substantial time, money, and other resources both to develop this confidential and proprietary information and takes (and has always taken) reasonable measures to protect it from dissemination to competitors and others outside of the company. These measures include, but are not limited to:

a. encrypting data on company-owned devices as well as devices with access to company data;

b. password protecting all company-owned devices and requiring that all devices with access to company data are password protected;

c. taking reasonable measures to limit the disclosure and distribution of such information to individuals who need access to such information to perform their job responsibilities;

d. requiring all employees to affirm, as part of their employment offer, that they will maintain the confidentiality of Herc's confidential and proprietary information and trade secrets; and

e. requiring employees to enter into restrictive covenant agreements that expressly prohibit the dissemination of Herc's trade secrets and confidential information for the use or benefit of any entity or person other than Herc.

35.    Accordingly, the above-referenced confidential and proprietary information and trade secrets are not generally known to the public.

36.    With access to highly sensitive, confidential, and proprietary information and trade secrets, Meyer has the knowledge necessary to engineer a strategy that would allow a competitor to unfairly and unlawfully compete with Herc.

**Herc's Legitimate Business Interests**

37.     The equipment rental industry serves a diverse group of customers from individuals and small local contractors to large national accounts, providing a wide variety of rental equipment, including mid-size and heavy equipment, specialty equipment, and contractor tools. The equipment rental industry is highly fragmented, with few national competitors and many regional and local operators.

38.     The growth and financial health of the North American equipment rental industry is driven by a number of factors, including economic trends, non-residential construction activity, capital investment in the industrial sector, repair, maintenance, and overhaul spending, government spending, and demand for construction and other rental equipment generally, including for remediation and rebuilding efforts related to natural disasters.

39.     Accordingly, Herc's business is highly competitive. For this reason, Herc spends substantial time, money, and effort on the development of budgets, effective marketing strategies, forecasting, compliance practices, operations, customer and business relationships, business plans, pricing, policies, procedures, training methods, and employee policies designed to enable the Company to maintain its competitive edge and excel in the industry.

40.     Herc relies on a foundation of trust and loyalty between it and its employees to promote the business model.

41.     The restrictive covenants signed by the Company's employees include clauses such as confidentiality clauses, non-solicitation clauses, and agreements to

return confidential and proprietary information and trade secrets. Each restrictive covenant is limited in scope to protect Herc's legitimate business interests while preventing undue hardship on the employee in his or her pursuit of employment in his or her area of expertise.

42.    Herc's legitimate business interests include, but are not limited to, confidential and proprietary information; trade secrets; market share in the industry; relationships with customers, vendors, referral sources, and employees; and Plaintiffs' reputation and goodwill in the industry.

## Meyer Departs Herc and Misappropriates Herc's Trade Secrets and Confidential Information

43.    Meyer departed in April 2026, providing assurances that he would be leaving the industry.

44.    Despite these assurances, Meyer subsequently accepted an engagement as an independent contractor providing senior operational advisory services to a direct competitor of Herc (the "Direct Competitor")[1], pursuant to a statement of work executed on or about April 20, 2026, through a staffing entity, with the engagement commencing on or about April 27, 2026.

45.    Although the Direct Competitor historically had focused primarily on equipment manufacturing, shortly before Meyer accepted his engagement to provide operational advisory services, the Direct Competitor announced plans to grow its

---

[1]    The Direct Competitor referenced herein is not a party to this litigation and, for that reason, is not identified by name in this pleading.

14

equipment rental business and launched a major brand refresh to its equipment rental business.

46.    As set forth above, Meyer had access to Herc's most sensitive, confidential and proprietary information and trade secrets, all of which would be highly useful to the Direct Competitor's stated objective of growing its equipment rental business.

47.    Among the confidential and proprietary information and trade secrets to which Meyer had access were:

(a)    Herc's Chicago strategic growth plan, including non-public fleet and revenue data, market-share and revenue targets, and a detailed growth plan analysis of Herc's Chicago-market position, its strengths, weaknesses, and internal comments about how to position itself going forward;

(b)    Herc's P&L Tracking and Goals workbook, containing granular, non-public branch- and region-level financial performance and forecast data, including for the Midwest Market encompassing Meyer's former district;

(c)    Herc's internal workforce-planning and staffing-model formulas;

(d)    Herc's P&L Definitions & Targets workbook, containing Herc's financial performance targets and control measures by business line;

(e)    Herc's internal Branch Self-Review and Invoice Accuracy compliance workbook, reflecting Herc's proprietary internal audit methodology and branch-level compliance data (collectively, the "Trade Secrets").

48.    The confidential and proprietary information and trade secrets at issue give a level of insight into Herc's operations that no competitor could otherwise obtain. Herc's strategic growth plan discloses non-public revenue, market share, forecasts, revenue targets, and a candid internal assessment of Herc's strengths, weaknesses, and planned positioning in this market.

**49.**  Because this is one of the largest rental markets in the country, the confidential and proprietary information and trade secrets show a competitor precisely where Herc is most profitable, where it is vulnerable, and how it measures success across its business lines.

**50.**  A rival with that plan in hand would know it could underprice Herc in its strongest branches and exploit Herc's weakest ones without ever having to develop that intelligence independently.

**51.**  A competitor that obtained these operational blueprints could replicate Herc's efficiency and reliability advantages without incurring the years of trial and error Herc invested to develop them, causing competitive harm that scales with the size of the market itself.

**52.**  The confidential and proprietary information and trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, Herc's competitors and would provide any such competitor with an unfair competitive advantage if obtained.

**53.**  Herc provided Meyer with access to the confidential and proprietary information and trade secrets solely so that he could perform his duties for Herc, and Meyer's access to and use of this information was expressly subject to the confidentiality obligations of his Agreement, which prohibited Meyer from using or disclosing Herc's confidential and proprietary information and trade secrets other than in furtherance of Herc's business and as authorized by Herc.

16

54.    Unbeknownst to Herc, Meyer retained the confidential and proprietary information and trade secrets.

55.    On information and belief, Meyer retained other documents of Herc that contain its confidential and proprietary information and trade secrets.

56.    After beginning to perform services for the Direct Competitor, on or about May 19, 2026, Meyer transmitted the Trade Secrets from an unidentified e-mail account bearing his name, using an Android device, to an e-mail address associated with the Direct Competitor, while still bound by his restrictive covenants:

| From: | Christopher Meyer[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=0b5efbf0ca4b4464a689c624470c2bde-6dc677bb-a8] |
|---|---|
| Sent: | Tue 5/19/2026 11:14:11 AM (UTC-04:00) |
| To: | Christopher Meyer[Christopher.Meyer1@█████████ |
| Attachment: | Workforce Planning Formuals Reformatted.docx |
| Attachment: | P&L Tracking_Goals.xlsx |
| Attachment: | MYM Chicago 3.26 CC to Team .pptx |
| Attachment: | MYM Chicago 3.26 Working chris.pptx |
| Attachment: | Structured Outreach Plan for Equipment Rental TSRs.docx |
| Attachment: | P&L Definitions & Targets 2025.xlsx |

Get Outlook for Android

57.    Meyer's retention, use, and distribution of the confidential and proprietary information and trade secrets were not authorized by Herc, were not made in furtherance of Herc's business, and were not undertaken for any purpose permitted under Meyer's Agreement.

58.    On June 11, 2026, upon learning that Meyer was working with the Direct Competitor, Herc sent Meyer a letter reminding him of his ongoing confidentiality,

non-competition, and non-solicitation obligations under RCA, demanding information regarding his new engagement, demanding an attestation that he had not retained or disclosed Herc's confidential information, and asking that he preserve all relevant evidence.

59.     On or about June 17, 2026, Meyer responded to this letter, denying that he was working for the Direct Competitor, acknowledging his contractual and other legal obligations and categorically denying that he had violated any provision of RCA.

60.     Meyer explicitly denied retaining, accessing, or disclosing any confidential, proprietary, or trade secret information belonging to Herc, and he represented that he was abiding by that commitment.

61.     All the statements made in the June 17, 2026 response were false.

62.     On or about July 3, 2026, the Direct Competitor responded to Herc's letter, representing that it had independently instructed Meyer not to use or disclose any of Herc's confidential, proprietary, or trade secret information in connection with his engagement, including by uploading, downloading, or storing such information on the Direct Competitor's systems or devices.

63.     Days later, on or about July 10, 2026, the Direct Competitor disclosed to Herc that, in the course of its internal review, it had discovered the May 19, 2026 e-mail described above, together with an additional document found on Meyer's company-issued device.

64.     Meyer's unauthorized taking, retention, and transmission of the confidential and proprietary information and trade secrets upon and after his departure

18

from Herc, and his subsequent engagement with the Direct Competitor while in possession of the confidential and proprietary information and trade secrets, constitute misappropriation under both the DTSA and FUTSA along with the RCA, as set forth in the causes of action below.

### Herc's Entitlement to Injunctive Relief

65.    Herc has clearly ascertainable rights in need of protecting including to: (a) preserve and maintain the integrity of its confidential and proprietary information and trade secrets together with the goodwill and market share it expended significant time and resources to create; (b) prevent Meyer from violating the bargained-for provisions contained in his RCA; and (c) prevent Meyer from unlawfully and unfairly competing with Herc through a position with the Direct Competitor or any other entity in competition with Herc; and (d) protect its customers and prospects from solicitation by Meyer, through his direction, or with his assistance.

66.    The RCA is a valid and enforceable contract that prohibits Meyer from, among other things: (a) working for a competitor of Herc for one year following his separation of employment; (b) soliciting Herc's customers for one year following his separation of employment; and (c) misappropriating Herc's confidential and proprietary information and trade secrets.

67.    Herc fully performed its obligations under the RCA.

68.    Meyer has engaged in and is continuing to engage in conduct that constitutes a material breach of numerous provisions in the RCA and is otherwise unlawful.

19

69.     Herc has suffered and will continue to suffer irreparable harm and economic damages as a result of Meyer's unlawful conduct. Moreover, Herc has an urgent need to protect its legitimate business interests.

70.     There is no adequate remedy at law that might address the irreparable injury caused by Meyer's actions. Absent relief, there is no way to accurately forecast the effect on Herc's business over time or the extent of the long-term damages due to Meyer's actions.

71.     Herc is likely to prevail on the merits in this action. Should Herc be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably harmed because it will continue to lose business, goodwill, and customers that it may never recover.

72.     Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest and the harm to Herc absent the requested relief strongly outweighs the risk of harm to Meyer should injunctive relief be granted. The public interest is, in fact, served by an injunction, as it protects Herc's confidential information and goodwill and enforces those contractual promises that Meyer made to Herc as a condition of his employment and as consideration for Herc's agreement to give Meyer access to its clients and confidential information in the first place.

73.     Herc has been required to retain the law firm of Ogletree Deakins to represent it in this action and has been obligated to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### COUNT I — MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, et seq.

74.    Herc realleges and incorporates by reference paragraphs 9 through 73 above as if fully set forth herein.

75.    The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., creates a private civil cause of action for the "owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). A "trade secret" includes financial, business, and technical information that the owner has taken reasonable measures to keep secret and that derives independent economic value from not being generally known to, or readily ascertainable by, another person who can obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

76.    "Misappropriation" under the DTSA includes the acquisition of a trade secret by a person who knows or has reason to know the trade secret was acquired by improper means, or the disclosure or use of a trade secret without consent by a person who used improper means to acquire knowledge of the trade secret, or who, at the time of disclosure or use, knew or had reason to know the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. 18 U.S.C. § 1839(5).

77.    While employed by Herc, Meyer had access to Herc's confidential and proprietary information and trade secrets, including its confidential customer account

and market-strategy data, business operations and strategic plans, sales methodologies, staffing formulas, and financial performance and target data, as described above.

78.    Herc expended substantial time, effort, money, and resources in developing and maintaining this information.

79.    Herc takes reasonable, affirmative measures to maintain the confidentiality of this information for Herc's exclusive benefit and competitive advantage, including the measures described above.

80.    This information is Herc's Trade Secrets.

81.    The Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as the Direct Competitor.

82.    The Trade Secrets constitute information subject to protection under the DTSA, 18 U.S.C. § 1839(3), and relate to services used in, or intended for use in, interstate commerce.

83.    By signing RCA, Meyer knew he had a duty to maintain the secrecy of, and not disclose or misappropriate, Herc's Trade Secrets, and to return any Trade Secrets in his possession upon separation.

84.    Meyer had actual knowledge that the information he obtained during his employment with Herc, described above, constituted Herc's Trade Secrets.

85.    Meyer misappropriated Herc's Trade Secrets by acquiring, retaining, and transmitting them without authorization and for purposes not permitted under RCA,

including by e-mailing at least six documents containing Trade Secrets to himself outside Herc's corporate e-mail system on or about May 19, 2026, and by retaining at least one additional document containing Trade Secrets on his or the Direct Competitor-issued device.

86.    Meyer misappropriated Herc's Trade Secrets, or appropriated them without authorization, by taking, retaining, and not returning them after his employment with Herc ended.

87.    Meyer misappropriated Herc's Trade Secrets, or appropriated them without authorization, by seeking to disclose them to the Direct Competitor in connection with his subsequent independent-contractor engagement with the Direct Competitor.

88.    Meyer knew, or should have known, that he was prohibited from retaining, disclosing, or using Herc's Trade Secrets after his employment with Herc ended.

89.    Meyer's misappropriation was willful and malicious.

90.    Unless Meyer is permanently restrained and enjoined from using or disclosing the Trade Secrets, Herc will suffer irreparable injury, as Meyer will continue to have the ability to use or disclose Herc's Trade Secrets for his own benefit or that of the Direct Competitor.

91.    As a direct and proximate result of Meyer's misappropriation of Herc's Trade Secrets, Herc has suffered, and will continue to suffer, irreparable harm and

economic damages, including disruption of business, lost revenues and profits, and unjust enrichment not otherwise accounted for in computing actual loss.

92.     Herc has retained the law firm of Ogletree Deakins to represent it in this action and is entitled to recover its reasonable attorneys' fees and litigation costs to the full extent allowed under the DTSA.

**COUNT II — MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT, Fla. Stat. § 688.001, et seq.**

93.     Herc realleges and incorporates by reference paragraphs 9 through 73 above as if fully set forth herein.

94.     The Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, et seq., similarly defines a "trade secret" as information that derives independent economic value from not being generally known to, or readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and that is the subject of efforts reasonable under the circumstances to maintain its secrecy.

95.     Under FUTSA, "misappropriation" includes acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means, and disclosure or use of a trade secret without express or implied consent by a person who used improper means to acquire knowledge of it or who knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy.

96.     While employed by Herc, Meyer had access to Herc's Trade Secrets, including its confidential customer account and market-strategy data, sales

methodologies, staffing formulas, and financial performance and target data, as described above.

97.    Herc expended substantial time, effort, money, and resources in developing and maintaining the Trade Secrets.

98.    Herc takes reasonable, affirmative measures to maintain the confidentiality of the Trade Secrets for Herc's exclusive benefit and competitive advantage, including the measures described above.

99.    The Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as the Direct Competitor.

100.    The Trade Secrets constitute trade secrets subject to protection under the FUTSA.

101.    By signing RCA, Meyer knew he had a duty to maintain the secrecy of, and not disclose or misappropriate, Herc's Trade Secrets, and to return any Trade Secrets in his possession upon separation.

102.    Meyer had actual knowledge that the information he obtained during his employment with Herc, described above, constituted Herc's Trade Secrets.

103.    Meyer misappropriated Herc's Trade Secrets, or appropriated them without authorization, by taking, retaining, and not returning them after his employment with Herc ended.

25

**104.** Meyer further misappropriated Herc's Trade Secrets, or appropriated them without authorization, by seeking to disclose them to the Direct Competitor in connection with his subsequent independent-contractor engagement with the Direct Competitor.

**105.** Meyer knew, or should have known, that he was prohibited from retaining, disclosing, or using Herc's Trade Secrets after his employment with Herc ended.

**106.** Meyer's misappropriation was willful and malicious.

**107.** Unless Meyer is restrained and enjoined from using or disclosing the Trade Secrets, Herc will suffer irreparable injury.

**108.** As a direct and proximate result of Meyer's misappropriation of Herc's Trade Secrets, Herc has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment.

**109.** Herc has retained the law firm of Ogletree Deakins to represent it in this action and is entitled to recover its reasonable attorneys' fees and litigation costs to the full extent allowed under FUTSA.

## COUNT III – BREACH OF CONTRACT

**110.** Herc realleges and incorporates by reference paragraphs 9 through 73 above as if fully set forth herein.

111. The contractual provisions referenced below and contained in the RCA are valid and enforceable contractual obligations between Meyer and Herc. The RCA is a valid contract between Herc and Meyer.

112. Herc performed its obligations under the RCA. It provided Meyer with—and Meyer received—valuable consideration for the restrictive covenants under Florida law in that Herc employed and continued to employ him. It provided him with, and he received access to Herc's confidential and proprietary information and trade secrets, clients, and prospects, as well as specialized training.

113. As described in more detail both above and below, Meyer breached these contractual provisions.

114. Herc further alleges, upon information and belief, that Meyer intends to further breach those provisions in the future.

115. By breaching these valid and enforceable contractual provisions in the RCA, Meyer has caused damages to Herc in an amount that is currently unknown and incalculable but which will be calculated in discovery and before trial.

116. Herc has suffered and will continue to suffer damages and irreparable harm as a result of Meyer's actions.

117. The Non-Competition Provision prohibits Meyer from being employed by "any business. . . that is directly or indirectly in competition with [Herc] within one hundred (100) miles of the Company branch, location, or office(s) where [Meyer] worked or was employed, or provided support or services, or within the geographic

scope of [Meyer's] responsibilities at the time of [his] termination and during the twelve (12) month period preceding termination." (Ex. 1, RCA at § 3(b)).

118. Likewise, the Non-Solicitation Provision prohibits Meyer from "directly or indirectly; (i) Solicit[ing] or attempt[ing] to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of [Herc] whom [Meyer] came to know, came to service, had material contact with or came to learn the identity of or about whom [Meyer] had Confidential Information while [he] was employed by [Herc.]" (Ex. 1, RCA at § 3(c)).

119. The one-year period in the Non-Competition and Non-Solicitation Provision, however, is tolled during the period in which Meyer is in breach. (*Id.* at § 3(g)).

120. Meyer's acceptance of a role with the Direct Competitor, misappropriation of Trade Secrets, and attempts to utilize Herc's Trade Secrets for that engagement constitute a direct breach of the Non-Competition Provision.

121. The restrictive period of the Non-Competition and Non-Solicitation Provision does not expire until twelve months after Meyer cures his breach under that Provision.

122. Herc has suffered and will continue to suffer damages and irreparable harm as a result of Meyer's actions.

## COUNT IV – BREACH OF DUTY OF LOYALTY

123.    Herc realleges and incorporates by reference paragraphs 9 through 73 above as if fully set forth herein.

124.    While employed with Herc, Meyer had fiduciary duties of loyalty to Herc to not actively use his position for his own personal benefit, or for the benefit of other companies, and/or to hinder Herc's ability to succeed in its business operations.

125.    Meyer, through his position at Herc, had access to Herc's confidential and/or proprietary information and/or Herc's Trade Secrets.

126.    Meyer was reposed with trust and confidence by Herc, which he knew and voluntarily accepted.

127.    During his employment with Herc, Meyer breached his duty of loyalty to Herc by taking steps to prepare to compete with Herc by downloading, retaining, acquiring, or obtaining Herc's confidential and/or proprietary information and/or Herc's Trade Secrets to prepare to compete with Herc.

128.    Through this conduct, Meyer engaged in disloyal acts in anticipation of a future engagement with Herc's competitors, including the Direct Competitor, breaching his duty of loyalty.

129.    As a proximate result of Meyer's respective actions, Herc has suffered and will continue to suffer damages, including punitive damages.

**REQUEST FOR RELIEF**

Herc respectfully requests that this Court enter judgment for the Company and against Meyer as follows:

**A.**    Temporarily, preliminarily, and permanently enjoining Meyer from continuing to violate the confidentiality provisions of Section 3(a) of his RCA, including, but not limited to, enjoining him from using, disclosing, retaining, or further transmitting any of Herc's confidential and proprietary information and trade secrets that Meyer transmitted via an unidentified e-mail account on or about May 19, 2026 and the additional document retained on one or more devices, and award Herc all damages to which it may recover under applicable law suffered as the direct and proximate result of Meyer's breach of the confidentiality provisions of his RCA and Trade Secrets Acts;

**B.**    Ordering Meyer to immediately return to Herc any and all of its electronic and hardcopy confidential and proprietary information and trade secrets and to take all steps necessary to effectuate a forensic examination of any and all devices capable of performing computing functions or storing electronic information that are owned by, have been used by, or have been accessible to Meyer at any time since the date six months prior to the date on which his employment with Herc terminated for the purpose of determining how he has accessed, used, disclosed, or misappropriated Herc's confidential and proprietary information and trade secrets;

30

C.     Granting Herc access to any and all personal and business accounts used for communication purposes by Meyer so that Herc may determine the extent to which Meyer took actions toward violating his obligations under the RCA;

D.     Granting Herc access to any and all electronic devices owned, used or accessed by Meyer for the purpose of determining if such devices contain copies of Herc's confidential and proprietary information and trade secrets, and permitting Herc to take any other appropriate and reasonable steps to recover its confidential and proprietary information and trade secrets and to ensure none of Herc's confidential and proprietary information and trade secrets was distributed or preserved by Meyer in any form;

E.     Enjoining Meyer from in any way divulging, disseminating, or utilizing Herc's confidential and proprietary information and trade secrets in the interim and permanently (including—but not limited—following a thorough forensic account requiring Meyer to permanently delete and/or destroy all copies of such confidential and proprietary information and trade secrets in his possession, custody, or control, in whatever form and on whatever device or account such information resides, and to certify such deletion and destruction in writing under oath);

F.     Temporarily, preliminarily, and permanently enjoining Meyer from continuing to violate any of his obligations under his RCA including, but not limited to, enjoining him from continuing to perform competitive services for any competitor and award Herc all damages to which it may recover under applicable law suffered as the direct and proximate result of Meyer's breaches;

31

**G.**    Temporarily, preliminarily, and permanently enjoining Meyer from continuing to violate any of his obligations under his RCA and the Trade Secretes Acts including, but not limited to, enjoining him from continuing to solicit or attempt to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of Herc whom he came to know, came to service, had material contact with or came to learn the identity of or about whom he had confidential and proprietary information and trade secrets while he was employed by Herc; and

**H.**    Entering judgment against Meyer, and awarding Herc all damages available under applicable law together with prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief, at law or in equity, as the Court deems just.

DATED:  August 4, 2026.                     Respectfully submitted,

                                            */s/ John C. Getty*
                                            **Caren Marlowe**; FBN: 514586
                                            caren.marlowe@ogletree.com
                                            **John C. Getty**; FBN: 1013911
                                            john.getty@ogletree.com
                                            OGLETREE, DEAKINS, NASH,
                                             SMOAK & STEWART, P.C.
                                            100 North Tampa Street, Suite 3600
                                            Tampa, Florida  33602
                                            Telephone: 813-289-1247
                                            Facsimile:  813-289-6530

                                            *Attorneys for Plaintiffs, HERC HOLDINGS*
                                            *INC. and HERC RENTALS INC.*